McPHERSON *v.* WESTERN UNION TELEGRAPH CO.

1. TELEGRAPHS AND TELEPHONES—NONDELIVERY OF MESSAGE—DIRECTED VERDICT—DAMAGES.

In an action for damages for the loss of a contract of employment, alleged to have been caused by defendant's failure to forward a message to plaintiff on board a steamer at M., where the evidence shows that plaintiff did not arrive at M. till the following day, which was Sunday, and the steamer remained in port Sunday and Monday, and that a delivery on Monday would have enabled plaintiff to secure the position, defendant was not entitled to a directed verdict for the reason that plaintiff was not at M. on Saturday to receive the message had it been forwarded.[1]

2. SAME—DAMAGES—CONTRACT OF EMPLOYMENT.

Where the proposed contract of employment was definite as to salary and term of employment, and the evidence shows that the employer was desirous of engaging plaintiff and plaintiff was desirous of securing the position, it was sufficiently definite in its terms to furnish a basis for recovery, notwithstanding it gave the employer the right to discharge plaintiff for a violation of the rules, and plaintiff had the right to leave before the end of the term if he chose to do so.

[1]Generally, on the right of addressee of telegram to sue for delay in delivery, and damages recoverable, see note in 30 L. R. A. (N. S.) 1116.

Error to Wayne; Mandell, J.   Submitted January 7,
1915.   (Docket No. 20.)   Decided December 22, 1915.

Case by Russell R. McPherson against the Western
Union Telegraph Company for damages for failure to
forward a message.   Judgment for plaintiff.   Defend-
ant brings error.   Affirmed.

*Corliss, Leete & Moody* and *Benj. S. Pagel*, for ap-
pellant.

*A. Ward Copley*, for appellee.

BIRD, J.   Mr. F. D. Root, of Sault Ste. Marie, sent to
plaintiff, at Detroit, a telegram via defendant's wire,
reading:

"Do you want to sail the tug Thompson?   If so, wire
at once and when you leave?"

The telegram arrived in Detroit between 9 and 10
o'clock on the morning of June 15, 1912.   Plaintiff's
dwelling was called by phone, his mother answered,
and agreed to and did accept the message.   Upon re-
flection it occurred to her that the message should be
forwarded to plaintiff at once, so she called the defend-
ant on the phone, and inquired if the message could be
forwarded to plaintiff, and the reply was that it could
be.   She thereupon directed defendant to send it to
plaintiff at Milwaukee, Wis., in care of the "Steamer
Wisconsin," with the further direction "to be sure and
send the message, because it meant a lot to my son."
Instead of forwarding the telegram as agreed in the
regular way, through some oversight, it never left the
Detroit office.   Plaintiff had no knowledge of the offer
of employment until his boat, the "Wisconsin," passed
Detroit on its way down on June 22d, when he received
through the marine post office a letter from his wife
informing him that a position had been offered him at
the Soo.   Upon obtaining this information he at once

resigned his position on the Wisconsin and came ashore. Later he learned that the place offered him by Root had been filled by another. He then accepted employment on another boat for the balance of the season at a much less salary than that offered by Root, and this suit was instituted, counting upon defendant's negligence, to recover compensation. Judgment passed in his favor in the sum of $487.

1. Appellant takes the position that a directed verdict in its behalf should have followed the conclusion of the proofs, because it was made to appear thereby that plaintiff was not at Milwaukee on June 15th to receive the telegram, had the same been sent in due course of business. It appears that the Wisconsin, instead of arriving at Milwaukee on Saturday the 15th, did not arrive there until early Sunday morning, June 16th, and that she lay in port the 16th and 17th.

The telegram was tendered to and accepted by defendant at Detroit. No further or other address was requested than the one given. It was advised at the time of its acceptance that plaintiff was aboard the steamer Wisconsin, and it thereby became its duty to employ such means to effect its delivery as is usual in making delivery of telegrams addressed to persons en route on railway and steamship lines. The delivery of such telegrams is usually attended with more difficulty than those addressed to persons at their homes or business places. Had the telegram gone forward in due course, defendant's Milwaukee agent would have doubtless made the usual effort to deliver it, and, had he done so, it is quite likely that it would have resulted in his obtaining information when the steamer Wisconsin would arrive, and where she would dock. It appears to be assumed that, if the telegram had gone forward on Saturday, it could have been delivered had plaintiff been there to receive it. If this be so, and the telegram could have been delivered to the steamer Wis-

consin on Saturday, had sne been there, no good rea-
son suggests itself why it could not have been delivered
at the same place on Monday morning when she was
there. A delivery as late as Monday morning would
have enabled the plaintiff to secure the position by
wire. At any rate, whether it could have been deliv-
ered was a question which was within the province of
the jury.

2. The further contention is made that, if plaintiff
was entitled to recover, he was entitled to recover nom-
inal damages only, because his contract was uncertain
and did not provide for a definite or fixed term of em-
ployment. The plaintiff testified that:

"It was customary to continue a sailor in the occu-
pation during the year until the close of navigation,
if he is satisfactory."

Frank G. Root testified as follows:

"I am local manager for the Thompson Wrecking
Association and live at Sault Ste. Marie. I have held
that position since the spring of 1902. I have known
Russell McPherson, of Detroit, since the spring of
1902, he worked for me. I sent him a telegram in
June, 1912, asking him if he wanted to sail the tug
Thompson, and if he did to wire me at once. We knew
we would have to pay him $125 ($135) a month and
his employment would last as long as we wanted to
keep that tug in commission. * * * I would not
say positively, but I think we kept that tug in com-
mission until the last of November, or something like
that."

Cross-examination:

"Q. Was Mr. McPherson's employment to be by the
month?

"A. No, as long as we could keep the tug in opera-
tion and he give satisfaction.

"Q. As long as he gave satisfaction?

"A. As long as we wanted to use him.

"Q. Were you employing him as long as he was to
give satisfaction?

"*A.* As long as we kept the tug in commission.

"*Q.* You also said you employed him as long as he gave satisfaction?

"*A.* He gave satisfaction, yes.

"*Q.* If he had reported to you on Monday, the 19th day of June, 1912, and had gone to work as captain, and during that week he had done something which you considered a breach of the rule for which you wanted to discharge him, could you have discharged him?

"*A.* I certainly could. We got a captain for the tug, I think, on the evening of the 17th, and he went to work that evening at 6 o'clock.

"*Q.* The wage of $135 per month was not payable in advance, was it?

"*A.* No.

"*Q.* The man had to complete four weeks' work before he was entitled to his $135?

"*A.* No, we paid them every two weeks.

"*Q.* You paid the men every second week?

"*A.* Yes, sir.

"*Q.* They had to complete two weeks before they were entitled to anything?

"*A.* If he wanted to leave us he could demand pay and we would have to pay him any time.

"*Q.* For the time he worked up to that time?

"*A.* Yes, sir.

"*Q.* Sometimes it happens that a man leaves the middle of the season to go to another position?

"*A.* The fellow left this boat and that is why I wanted to get Russell to take his place."

From the testimony of these two witnesses, it fairly appears that the contract which they had in mind was that plaintiff should be employed to sail the tug Thompson for the balance of the season at a salary of $135 per month if he gave satisfaction, with the privilege to the employer to discharge him for a violation of the rules, and with the privilege to the employee of leaving before the end of the season if he chose to do so. The chief point raised against this contract was that it was at the will of the employer, and therefore too uncertain upon which

to base an action of damages. We do not take this view of it. In the event that plaintiff gave satisfaction he was entitled to work during the balance of the season of navigation, which in the season of 1912 was about the first of December. Had the manager discharged the plaintiff for any reason except a violation of the rules, or because he was not satisfactory, his company would have been liable in damages therefor. The contract gave the employer the right to discharge him if he violated the rules; but we cannot assume that the plaintiff would have violated the rules, nor can we assume that he would have voluntarily left before the end of the term, it being an employment which he was anxious to secure. The salary was definite, the term of employment was definite, Root was desirous of employing plaintiff, and plaintiff was desirous of securing the position, and he testified that, if he had received the telegram in season, he would have accepted the position. We think a contract was contemplated which was sufficiently definite and certain in its terms to furnish a basis for recovery. For a case very similar on the facts and questions raised, see *Western Union Telegraph Co.* v. *Fenton*, 52 Ind. 1. See, also, *Robinson* v. *Telegraph Co.*, 169 Mich. 503 (135 N. W. 292).

Taking this view of the contemplated contract, it will be unnecessary to consider the other assignments of error.

The judgment is affirmed.

BROOKE, C. J., and KUHN, STONE, OSTRANDER, MOORE, and STEERE, JJ., concurred.

The late Justice MCALVAY took no part in this decision.